Our second case this morning is David Hakim v. Safariland, LLC. May it please the Court, I'm Paul Esposito. I'm here with John Patton and Todd Porter today representing Safariland and Defense Technology. I want to make three major points. First of all, plaintiffs needed an expert in this warnings case and didn't have one. The product is complex enough and requires specialized knowledge enough that an expert is needed. That's the law in both the federal court and in Illinois. And we talk about that in our brief and I'll leave that to the brief to talk about the specific details. I think the bigger problem here with the failure to warn is that they needed an expert to set up how the consumer expectation test would apply to this case. The plaintiff tried this case under the consumer expectation method of proof. You need to establish what an ordinary consumer, and the ordinary consumer is a SWAT officer, would expect the round to perform and how it would expect the round to perform. An ordinary consumer is much akin to the reasonable man in the negligence standard. It's a hypothetical person. It doesn't get established by parading SWAT officers, many of whom were trainees, and saying what he expected. The Illinois Supreme Court has said it's an objective standard, not a subjective standard. And the way it gets established is by putting on evidence that a normal juror would not be appreciative of, would not understand, because it doesn't fall in their realm of life. To deal with what is the training? What is the experience? What are the job situations? What are the knowledge? What is the perception of officers and awareness of officers such that they would have an expectation about this product they were using? Well, if you could focus on the warning theory, because that's the only theory of liability that the jury credited here. That's a warning statement. The requirement of an expert for a design defect case is not relevant here because the jury found for your client on the design defect and the manufacturing defect theories. But a warnings claim needs to have an expert when there's knowledge that needs to be established beyond the understanding of the ordinary jury. This whole appeal here is focusing on the warnings theory. I'm not talking about design theory at all. We won that case. Right, but you were talking about the consumer expectation test. Right. And consumer expectations test applies in warnings cases. That's how the case was tried. But it shakes out a little bit differently because design defects are typically inherently complex. Sure. And warnings cases are evaluated a little bit differently insofar as what the jury needs to find. But the warnings had to be looked at, whether our warnings were adequate, had to be looked at under the test of what an ordinary consumer would know about the weapon, know about the ammunition here, such that a warning would be necessary. But Mr. Esposito, you would agree that in a pure negligence case, say, for example, a case where a plaintiff walks down the street and there's a bump in the sidewalk and then trips on the sidewalk and argues, number one, the maintenance of the sidewalk was defective, and number two, that the city should have had a sign. Certainly as to the first, you might need expert testimony to talk about what the industry standard is in maintaining sidewalks, et cetera, et cetera. But as to whether or not there should be a warning, why would a jury need expert testimony to tell them whether or not it would be reasonable in the circumstances to have a warning? Isn't that what juries do? They determine whether something is reasonable or not reasonable? But they do it in the context of knowledge. The law is pretty clear that you don't need to warn of something that's obvious. There's nothing obvious about this breaching round. That was the problem. And the question is, okay, so what would these SWAT officers need to know about this round that they didn't already know? We gave warnings. I mean, there's no question. We gave a lot of warnings. The question is whether the warnings were adequate. It's plain as position that they weren't adequate. And what they needed to do is establish that the ordinary consumer, being a SWAT officer, with all his knowledge, with all his training, with all his experience, with all his awareness, would not understand the things that he needed to do. But isn't that test on a continuum, though? Because you can think of various scenarios where a jury may or may not know about particular things, like walking down the sidewalk. Obviously, that's one extreme. But with regard to warnings, what you're asking for is a categorical rule. No. No? No, I'm not. You're not? No. We're asking for in this case. There are cases. I mean, it's very clear. I mean, even in design cases, you don't necessarily need an expert if the problem is so obvious that expert testimony is not needed. We are not asking for a per se rule. We are working with the facts of this case and saying, in this case, you needed an expert. That's point one. So I saved my time. I'd like to move to the second one. What Plaintiff was saying here is that our warning was defective because we didn't say in so many words, this round will not be stopped by wood and you absolutely needed to hit metal to make it disintegrate. That was his claim. But the case is not about explicitness of terms. It's about adequacy of the warning that gets looked at, and again, in the context of the entire case, look at the warning. First of all, let's remember that there's no testimony from anyone. In fact, there's testimony from Mr. Hakeem that he didn't even read the warnings. There's no testimony that the DuPage County Sheriff's Office didn't have the warnings.  But when you look at the warnings themselves, the warnings said, upon proper deployment, it will defeat locking mechanism. It describes mechanisms, all metal, that are attached to any wooden or hollow corridor. And it says on impact with the target, it will disintegrate into a fine powder. That's telling a reader who read it that you need to hit metal and it will go through wood. But didn't also the product literature note that the breaching rounds will disintegrate? I think the wording is on contact with a hard surface. Sure. Isn't wood a hard surface? Wood is a hard surface. So is a cracker. So is a cookie. So are a lot of things. But you have to put this in the relative context. Let me tell you why the officers would note something different. If you haven't looked at it already, please, please look at the video. What you'll see in the video is two SWAT officers trained to use the weapon, trained to use the ammunition, go up to a door that has hinges on it. They shoot into the door and blow out the hinges. When you look at that video, what you'll see is two holes next to each hinge. Three hinges, six holes. What it shows anyone, what it shows anyone who's looking at it, is that this round is intended to penetrate a door to break the metal. I mean, and that's how it would be. I mean, these officers are trying to get into space. They're trying to get into another space that's been closed to them. And they're faced with a wooden door that is hiding locking mechanisms. If you would shoot that round and hit the door and it would just disintegrate upon hitting the door, what the heck good is it? I mean, you're not getting in. And you might be harming these hostages who now are well known are trying to be rescued. It has to go through wood to hit the metal. That's its purpose, and that's what it says. And it's told, these officers are told how to use it, how to shoot it, the 45, 45-degree angle, that they shoot it into a backstop so pieces don't go flying all over the place. And you don't shear, which is exactly what these guys did, what alunas did. It tells them that if you don't follow the instructions, you have serious to lethal consequences. It tells them that to use this ammunition with extreme care and caution. It tells them everything they need to know. And by the way, that expert would have helped saying this is what they knew. There's the video evidence. Officer Cody, one of the SWAT officers, testified that at that training session, they were told that the round has to hit metal to disintegrate. Officer Hakim testified that looking at the literature, he would understand that you needed to hit metal to disintegrate the round. That was the whole purpose of this thing, to shoot through wood to break up metal, to destroy the metal. The court made a couple errors in this case with regard to this issue. Number one, it required too much explicitness. It required this explicit warning in the round. Then right as a whole, the warnings were adequate. Then it combined the 50A and 50B motions. In 50B, we were talking about the fact that these guys knew information that they didn't have to be re-instructed about. In 50A, we were talking about the warnings themselves, that the warnings were adequate. The court combined that and said, well, because there's a question about what they knew, then it's a question of fact as to what the warning said. Those are two different issues. They go to the same failure to warn defense that we're making, but those are two different issues. The final issue is proximate cause. We've briefed that. I'm probably running out of time right now. The fact of the matter is that this training exercise was wrong from beginning to end. What plaintiffs did not offer any evidence of is what would have been done different if we said what they wanted us to say? How would that training exercise be conducted different? Would they have used a different round? Would they have provided more training? Would they have checked better to see where people are located? Would they have not used the shearing technique? All those things. There is no evidence. The evidence is manifestly against their case as to proximate cause. Did you, on your causation argument, post-verdict, did you raise the issue of the failure to read the warnings? The failure to read the warnings as establishing or as defeating any causation. I think that came into the adequacy of the warnings. I think that's where that was briefed, Your Honor. Not on the matter of causation. That's a causation argument. The failure to read under Illinois law, failure to read warnings defeats causation. The Illinois Supreme Court and the Illinois Appellate Courts have said if you don't read the warnings, you don't have a failure to warn claim. That's where it came into the adequacy of the warnings. Right, because of the lack of causation. So was it argued as a causation? I don't call it limited to causation. And if I can reserve the rest of my time, I'd appreciate it. That's fine. Thank you. Thank you. Mr. Scanlon.  May it please the Court. The defendants have been arguing that because a product's composition may be complex, an expert is needed to opine on the adequacy of the warning. That statement is contrary to Illinois law. It's in our brief, Collins and Palmer v. Avco. In a cite from Lott v. ITW, a district court case, it says, the fact that most juries will be unfamiliar with the WP's 100th operation does not require the conclusion that they are incompetent to make decisions about the adequacy of the warnings. That case is mentioned a few times in the brief. Collins v. Sunnyside, they basically just say, this is an Illinois appellate court case, and it's pretty clear. It says the adequacy of the warning is usually a jury question. As to Your Honor's inquiry with respect to, I think it's the Solis case that says, if you don't read a warning, that you're not entitled to its protection. Well, I've cited the case of Winnett v. Winnett, which is an Illinois Supreme Court case, and in that case, let me put my hands on this, yes, they said liability of a manufacturer properly encompasses only those individuals from whom injury from a defective product reasonably can be foreseen, and only in situations where the product is being used for which the purpose for which it is intended. That's at 57 Illinois 2nd 7th. Now, the Illinois Supreme Court, in saying that, has recognized there are situations where a car is driving down the road, and let's say it's a General Motors car, and a wheel falls off. Okay. Was that a warning case that you just quoted from? Yes, I have. That case you just quoted from, is that a warnings case? Oh, yes. Or is that a design defect? This is a warnings case. Okay. The example you're about to launch into has nothing to do with warnings. It has to do with manufacturing defect. We're not into either of the manufacturing or design here today. It's all about failure to warn. Right. Let's stick to failure to warn cases. The Solace case on failure to read warnings is a causation principle. There are no cases in Illinois that exempt a manufacturer from the duty to manufacture a reasonably safe product. That's black-letter law in Illinois. I don't understand what you just said. No one is saying that the defendant here is exempt from the requirements of product liability law. What I'm saying is the fact that David Hakeem, he's not a breacher, he had no intention of being a breacher, didn't read the warnings of no moment. He doesn't have to read that warning. There are people conducting it. And another thing, the Pell case that I cited in my brief, says that for a warning to be effective, it has to reach foreseeable users. Now, think about this. They have a certified breaching instructor teaching them how to breach. Right, and that instructor gave them the wrong instructions. Well, that's not what the evidence in this case was. The problem with this whole appellate and even the post-trial motion, they want to retry the case. They want to put all the evidence and facts in front of the district court and now the court of appeals and say, wouldn't you decide this differently? The district court said correctly. The jury had a right to decide that the warnings worked. What's your best evidence of causation? That the lack of the warning that you proposed, you're proposing that the product needed to carry a warning that only a hit on metal will cause the disintegration of the round. That was the proposed warning. They didn't have one. I get that that specific warning was not given. There were all kinds of other warnings given and the instructions about how to use this product, but that particular warning was not given. That's the theory of your warnings case. What's your best evidence of causation that is linked to that specific defect, the warnings defect, not the design defect, not the manufacturing defect? If the breaching instructor knew that that round had to strike metal to disintegrate, he probably wouldn't have tried the shearing technique. We need more than that for causation. We need factual cause and we need legal cause. The causation in this case is that the people that were conducting the breaching did not understand the characteristics of the round. They had no idea, as the district court said in its opinion denying the motion, they had no idea that the round could travel not only through the door, but through a riser in a closet, run into my client's body armor, dent the actual plate itself, and enter his spine. There was no warnings about anything of that nature. Mr. Scanlon, doesn't Solis, the case that Chief Judge Sykes was referring to, the reasoning in Solis was, I thought, that the court said that if the defendant had provided the right warnings, then the purchaser, because in Solis there was an end user and an intermediate purchaser, would have conveyed those warnings to the end users, and therefore that was sufficient for causation. Isn't that part of the reasoning in Solis? That is the reasoning. So in other words here, the round was sold to DCSO, and is your theory then that had the defendant provided DCSO with what you believe to be adequate warnings, then DCSO would have conveyed that to the SWAT team during its training exercise? Well, the problem with that proposition, at least I see it, is that the warnings that were provided never reached the consumer, which are the SWAT team members. And as a result of it not reaching them, they didn't know how to conduct this appropriately. They should have had the warnings were also inconsistent, as the court pointed out, because I think you even, Your Honor, said that at one point. Let me see if I can get this here. The defendant's brief says the court also stated that warnings were inconsistent on that point but did not identify any inconsistency. That's page 34 of the Safariland's brief. But I'm just going to cite from a couple of segments of the transcript. When slug hits hard surface, it disintegrates into fine powder. That's from the product literature. Actually, it says upon impact with the target. And the targets are described as door lock mechanisms, doorknobs, hinges, safety chains, and padlocks. It says all those things. First of all, there's no evidence whatsoever in the trial that any of that product literature was provided to any DCS SWAT team members or the county sheriff's office. That's not the manufacturer's fault. The manufacturer included the instructions for how to use this product, detailed instructions for how to use this product, including warnings, safety warnings, to the purchaser, the sheriff's department. And to the extent that they weren't passed along to the officers, particularly the officer who was injured here and the officer who did the shooting, that's on the sheriff's department. Assuming that they produced the warnings to the sheriff's office, there's no evidence of that. That's just an assumption that they're making. They never presented anyone from Safariland and said, here's what we enclosed with our box, and these warnings were in there. There's nothing about that. They were left to go on the Internet. That's where we got these things, by going on the Internet post-accident and looking at what their literature says. There's no evidence whatsoever that these warnings were provided to any of the officers. Wasn't there testimony from the supervisors, the trainers, that they had reviewed the instructions? Pat O'Neill was the only supervisor. He was a certified shotgun breaching instructor. He said nothing of the kind. He checked the record. Nothing of the kind that he got any records. He didn't even know where the rounds came from. He said he didn't even bring them there. But what we're saying is these warnings never, they may, in a perfect world, I suppose before they conducted the training session, they should have gone out and searched Safariland, drilled down and looked at the product literature. But they would have found this, and I'll repeat it again, because I've got this quote. When slug hits hard surface, it disintegrates into fine powder. That's docket 230, page 860, lines 9 and 10. They also say. What document does that appear on? Document 230. What document in the instructions for the product does that warning appear on? I mean, you're reading from a little note card. We had it on the Elmo in the courtroom. And what appears when you put up the Elmo? The reminders that I just told you, among other things. It has other information regarding the TKO rounds. Is it this? Is it this? Is it the frequently asked questions? Is it the Safariland group description of the product? Is it on the technological description of the product? Where does it appear? It appears on the first sheet you showed me, I believe. I don't have it in front of me. I don't have it here in my exhibits. I'm not seeing that on any of the documents I just showed you. It says if the impact with a target, the slug will disintegrate. And the targets are described as metal targets. They talk about they didn't use it correctly. Also in their product literature, it says a frangible round launched at a door at a 70 degree angle becomes negligible powder. Now, that's their product literature. And that's before you as well. So it is inconsistent. The shearing, and actually the jury heard testimony that the U.S. military does use the shearing technique. What we are doing here is we're taking little pieces of evidence that we're now arguing about which way the jury should have interpreted this evidence. They interpreted the evidence that they didn't, they failed to inform the officers about the dangerous propensities of this breaching round. None of these officers, they tried to spin it in their argument on their brief, but I pointed out that most of the arguments with respect to the warnings were, they're inconsistent. And they're not very specific. They say launching into it. The reason you want to launch it at a 45 degree angle, if you really read their instructions, they say nothing about it will cause it to dissolve. They're saying it's going to disable the locking mechanism. They're telling you how to disable the locking mechanism, not that it's a warning, because otherwise they would say it needs to strike metal to disintegrate, and they never say that. Mr. Scanlon, it seems to me that your best case is something like Venus v. O'Hara, or Hammond v. Northern American Asbestos Corporation, where I think in Venus, the Illinois public court stated that a supplier has a duty to supply adequate warnings to its immediate vendee and may be held liable to the ultimate user for failure to do so. And so it is the argument that you're making that regardless of whether or not the ultimate user actually read the warnings, that in the first instance the manufacturer has a duty to provide adequate warnings to the purchaser of the product? That's correct. And so how would you address Chief Judge Sykes' question or concern that, well, here doesn't the blame lie with DCSO for not conveying that warning? So is it your position that even if DCSO had not forwarded any sort of warnings to the SWAT team, that under Illinois law, Safariland would still have the duty to provide adequate warnings? They do, and I think the warnings that they provided clearly did not inform the SWAT officers that this round is extremely dangerous. They don't put anything about you should clear the rooms. Now, they're arguing in their brief that you should have cleared the area. There's nothing in that. That was in that disputed Exhibit 31D that was admitted as the last witness at trial, which was the subject of a mistrial motion. That was where they came up with the argument, but that's not really. Doesn't this discussion just demonstrate why an expert witness was necessary to explain what warnings are necessary for 12-gauge breaching rounds of this sort according to the law of Illinois and the requirement to make the product safe for the end user? I mean, none of this is within the contemplation of an average juror. It's pretty easy. There are certainly many complex products. In the cases I've cited, both Locke and Collins addressed that issue and said, listen, the warning, to be effective, has to be communicated to the end user. In this case, the SWAT team training on them. It wasn't. It's as simple as that. They didn't know that. But I'm talking about the adequacy of the warning. How is it within the contemplation of a lay juror to evaluate the adequacy of warnings for such a technical product? Well, first of all, the product may be technical. As I cited in the Locke case, the fact that most jurors will be unfamiliar with the product does not require the conclusion that they are incompetent to make decisions. I'm not talking about familiarity with the product. I'm talking about the level of expertise necessary to understand a warnings defect claim, what type of warnings are necessary to make this product safe for the end user. Well, the jury thought that the warnings were. I understand what the jury felt. I'm asking about whether that was appropriate to send to the jury without an expert to translate this into the standard of care for purposes of this field. This issue has been addressed in the defendant's Safari Lens Motion for Summary Judgment, which was denied. Incidentally, they apparently did not appeal it. It was addressed in the Rule 50A and 50B motions, which is not surprising. We had the same evidence that we had.  If you could just answer my question. I don't think you need an expert just because a product is complex. I think Illinois case law supports that conclusion. You require a seatbelt in a car. They warn you to wear one. That doesn't mean you need an automotive engineer to say what the mechanics of the car or . . . That's not a good analogy. Maybe not. Nonetheless, it is. I do not believe Illinois law requires an expert witness just because the round is . . . The round being complex, it's not complex either. This is compressed zinc. That's it. There's nothing complex about it. They advertise it as upon hitting contact, it disintegrates. Upon hitting contact with the metal target. They also say a hard surface. They're inconsistent, the warnings. They didn't say a metal surface. They said in order to disable the lock, you should shoot at a 45-degree angle at the hinge or the bolt. I got it. Although they also in their literature say 70 degrees is fine too. Disintegrates fine. They're a little inconsistent on their warnings about what you're supposed to do. I don't think in this case the warnings were communicated to the SWAT officer. I do not believe expert testimony is something as simple as that. Or like wearing a seatbelt. I don't think you need a mechanical engineer to come in and talk about the car. They know it's more dangerous if you don't have a seatbelt. I think we have your argument. Thank you. Your time has expired. Mr. Esposito. Your time has expired. Thank you, Your Honor. Just a couple points. I heard counsel say twice about the warnings provided. Warnings were provided. If warnings weren't provided, I'm sure we would have had someone from the DuPage County Sheriff's Office come in and testify that warnings were never given. We didn't have any burden of proof. Plaintiff did. Mr. Esposito, what about Commander Harris and his testimony of never seeing any product literature or any information that indicated that it was necessary to strike metal? That's what he testified, but no one testified. Commander Harris didn't testify that he read the product literature. No one testified that they read the product literature. Well, what was he responding to when he said what I just quoted? What he was responding to, Your Honor, is what was the prosecution way of presenting this case. That is, we'll call in every SWAT officer we can find and say, well, I didn't know this. I didn't know this. I didn't realize this. I didn't realize this. We could have done the same thing with SWAT officers nationwide who said exactly the opposite thing. That's why an expert was needed. He needed to set the standard, and that's what wasn't done. Mr. Esposito, the standard is that the end user must read the warning that you provided. The standard is, really, what would an ordinary SWAT officer, the hypothetical ordinary SWAT officer, with all his training, with all his experience, with all his knowledge and awareness and all this, what would they be expected to know about this case? So what does the expert provide? That he has talked to 20 SWAT officers, 40 SWAT officers? What's the baseline for the expert's capacity to inform the jury? The baseline would be, okay, what is the training that's given to a SWAT officer? Nationwide or non-online, whatever you want to do, whatever your geographical area is. What are they given? What kind of knowledge does a SWAT officer come into the job as? I mean, are they usually long-time vets of a law enforcement department? Are they usually military people? Are all these kind of things. What kind of experiences do SWAT officers typically have? What kind of calls do they respond to? What kind of things do they do? What's that got to do with the metal, hitting the metal? What would they respond to? Because what it has to do with, it has to do with what they would understand about what a shell that is supposed to go through a door to disable a metal attachment, hinge, throw, whatever. What would they expect? Would this normal SWAT officer, with all the experience and training and education, would he think that this shell, when I shoot it at the door, directly at the door, would he think it's going to disintegrate right there, it's going to splat, turn into a powder? Or would he think it's going to go through that door and hit the target that was always intended? Well, is the expert going to say that the SWAT officer at the end, the actual shooter, should have read the instructions? Is that what the expert's going to say? Is that what he's going to say a typical SWAT officer should do? Well, one SWAT officer testified that it's very important to read manufacturer's warnings. Yeah, I understand that. I'm trying to see the value added by the expert. First of all, I don't know where these experts, are you suggesting there is a body, a specific body of expertise about people involved with this kind of opportunity to shoot? We put on an expert. Huh? We put on an expert who had shot these rounds hundreds of times, who was a retired SWAT officer. I mean, yeah, there are people out there who would qualify by age, experience, training, all that would qualify under the federal rules as an expert. I understand that. I just need a little clarity on what actual testimony the expert would say that an average SWAT officer should have known before firing that shot. That's what we'd say was missing. And I believe the expert would say, yes, you should have known the capabilities of this round, what it does, how it's intended to operate, and whether you know it from intuition. Yeah, I understand. Yeah, and so what would he say the officer should, what was the component of the officer knowing what to do? Reading. Yeah, just read the warning. Is that the bottom line here? Not just read the warning. No, it's not the bottom line. It's not only reading the warnings, which they're given to be read, you know, but what is your knowledge base? How do you, you know, what are the other things that you know? I mean, it's like all of us. I mean, we know things just because we live and we experience and, you know, we do things. And there's knowledge. I mean, these guys just don't get dropped into this position. You know, they come with a history. And what's the typical history? What is the typical knowledge base? What is the typical learning? That's what an expert would testify to. Little vague to me, Mr. Esposito. I hope not. But to just say you should be a better informed SWAT officer, is that the bottom line of an expert? I think that's what you and I are. I'm struggling on it because you're talking bottom line. I'm not talking bottom line. I'm talking everything. Everything that would go into what an ordinary consumer. Listen, experts have significant and unique influences on juries. Would you agree? If they're admitted into evidence? And if they're good, they can. I mean, that's why we have expert testimony. So all I'm saying is it makes me uncomfortable if I can't read specifically what the expert's going to say about the average SWAT officer. Not that you've had 12 years of experience and you've shot it four times. I'm trying to see where that separates it from the lay assessment of a juror. Maybe this would help. If Planoff had called an expert, I think that one of the things that expert would have been doing in this case is saying, I've read their literature. I've read all these warnings. This wasn't adequate. And I think he would be saying, in saying that, is that if you read this, you wouldn't know what you're supposed to know. So I think reading is part of it. If that helps. Thank you. You're welcome. Good to see you. All right. Thank you very much. Our thanks to both counsel. The case is taken under advisement.